SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

NATIONAL STUDENT MARKETING CORP. et al., Defendants.

M.D.L. No. 105.
Civ. A. No. 225–72.

United States District Court,
District of Columbia.

Aug. 31, 1978.

Theodore Sonde, Bobby C. Lawyer, Richard O. Patterson, Edward B. Horahan, III, Washington, D. C., for Securities and Exchange Commission.

Sherwin J. Markman, Jean S. Moore, Peter Raven-Hansen, Hogan & Hartson, Washington, D. C., for Lord, Bissell & Brook, Max E. Meyer and Louis F. Schauer.

David Ginsburg, Lee R. Marks, Martha Jane Shay, Ginsburg, Feldman & Bress, Washington, D. C., for Cameron Brown.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This opinion covers the final act in a civil proceeding brought by the Securities and Exchange Commission (Commission or SEC) seeking injunctive sanctions against numerous defendants as a result of their participation in alleged securities laws violations relating to the National Student Marketing Corporation (NSMC) securities fraud scheme.[1] The original defendants included the corporation and certain of its officers and directors; the accounting firm of Peat, Marwick, Mitchell & Co. (Peat Marwick) and two of its partners; several officers and directors of Interstate National Corporation (Interstate); the law firm of White & Case and one of its partners; and the law

---

1. Other opinions filed by this Court in connection with this proceeding are reported at 430 F.Supp. 639 (1977); 73 F.R.D. 444 (1977); 402 F.Supp. 641 (1975); 68 F.R.D. 157 (1975), aff'd, 179 U.S.App.D.C. 56, 538 F.2d 404 (1976), cert. denied, 429 U.S. 1073, 97 S.Ct. 809, 50 L.Ed.2d 790 (1977); 59 F.R.D. 305 (1973); 360 F.Supp. 284 (1973).

firm of Lord, Bissell & Brook (LBB) and two of its partners. The majority of these defendants are not now before the Court. As discovery progressed during the pre-trial stages of this litigation, NSMC and other principal defendants consented to the entry of final judgments of permanent injunction or otherwise reached a resolution of the charges against them.[2] The only defendants remaining are Lord, Bissell & Brook; its two partners, Max E. Meyer and Louis F. Schauer; and Cameron Brown, a former president and director of Interstate, and presently a director of and consultant to NSMC.

The focal point of the Commission's charges against these defendants is the corporate merger of Interstate with NSMC on October 31, 1969. The principal question presented is whether the defendants violated or aided and abetted the violation of the anti-fraud provisions of the federal securities laws in two instances: (1) consummation of the NSMC merger; and (2) the immediately following sale of newly acquired NSMC stock by former Interstate principals, including certain of the defendants. These transactions are alleged to have occurred despite the prior receipt by the defendants of information which revealed that NSMC's interim financial statements, used in securing shareholder approval of the merger and available to the investing public generally, were grossly inaccurate and failed to show the true condition of the corporation. The information was included in a comfort letter prepared by NSMC's accounts. The Commission contends that these violations demonstrate a reasonable likelihood of future misconduct by the defendants, thereby justifying the requested permanent injunctive relief.

The matter was tried without a jury. After reviewing the extensive record in this case, the Court concludes, for the reasons stated below, that while each of the defendants violated the securities laws in specific instances, the Commission has not fulfilled its obligation of demonstrating a reasonable likelihood that they will do so in the future. Accordingly, the Commission's request for injunctive relief must be denied.

This opinion contains the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Initially it will present the background events of this proceeding, including details of the October 31 merger of Interstate and NSMC, and the stock sales by Interstate principals. The Court then will review the Commission's allegations against the defendants in light of the applicable legal principles. Finally, the Court will address the factors involved in its determination that injunctive relief is not warranted in this instance.

## I. BACKGROUND

### A. The Companies

National Student Marketing Corporation was incorporated in the District of Columbia in 1966. The company enjoyed early prosperity; it grew rapidly and experienced a steady increase in assets, sales and earnings. Its common stock, which was registered with the SEC and traded on the over-the-counter market, rose from an initial public offering of $6 per share in the spring of 1968 to a high of $144 per share in mid-December 1969.[3] The financial community held the company and its potential in high regard, and in anticipation of con-

---

2. NSMC consented to the entry against it of a Judgment of Permanent Injunction on July 27, 1972. Similar entries of judgment were made against the following defendants on the dates indicated: Bernard J. Kurek, May 7, 1974; Peat, Marwick, Mitchell & Co., July 2, 1975; Joseph Scansaroli, December 6, 1976; James F. Joy, December 30, 1976; Cortes W. Randell, January 25, 1977; Anthony M. Natelli, January 25, 1977; Robert A. Katz, April 26, 1977; Marion Jay Epley, III, May 16, 1977; Roger O. Walther, May 16, 1977; Donald A. Fergusson,

May 16, 1977; and John G. Davies, August 22, 1977. A settlement Order was agreed to between the SEC and White & Case and filed on May 16, 1977. Motions for summary judgment filed by Paul E. Allison, William J. Bach and Robert P. Tate were granted March 7, 1973.

3. The $144 per share figure is based on an adjustment for a 2-for-1 stock split in December 1968; the actual price in mid-December 1969 was $72 per share.

tinued high market performance, it was seen as a good "buy" prospect. Its management was considered aggressive, imaginative and capable; if there was a question of its integrity and honesty, it did not surface in the public arena until a later period. During this period, White & Case served as its outside legal counsel, with Marion J. Epley, III, as the partner immediately in charge of the firm's representation. Peat Marwick served as its outside accountant.

Interstate National Corporation, a Nevada corporation, was an insurance holding company. Its principal assets were several wholly-owned subsidiary insurance companies. The company's common stock was traded on the over-the-counter market and owned by approximately 1200 shareholders. Cameron Brown was president, chief executive officer, principal shareholder and a director of the company.[4] Other Interstate principals and directors included Robert P. Tate, chairman of the board; William J. Bach, general counsel; Paul E. Allison, secretary; Louis W. Biegler; and Max E. Meyer. Between board meetings, all management authority was delegated to an executive committee composed of Brown, Tate, Bach, Allison and Biegler. Max E. Meyer, a director and shareholder, was a partner in the Chicago law firm of Lord, Bissell & Brook, which had long represented Interstate and served as its outside legal counsel in all matters relating to the merger of the corporation with NSMC. Meyer, a personal friend and legal advisor to Cameron Brown, served as the contact partner for the Interstate account and was otherwise in overall charge of his firm's representation.[5] Another partner of the firm, Louis F. Schauer, was also involved in the merger transaction due to his experience in corporate and securities law. Peat Marwick served as Interstate's outside accountant during the period in question.

## B. The Merger Negotiations

National Student Marketing Corporation developed a reputation for having a unique and successful marketing network for selling its own and other products to college and high school students. Commencing in 1969, it undertook a highly active program to acquire companies specializing in selling goods and services to students. It was in this connection that NSMC first approached representatives of Interstate.

Initially, NSMC discussed the possibility of acquiring an Interstate subsidiary that specialized in selling insurance to students. After Interstate indicated an unwillingness to dispose of a single subsidiary, NSMC expressed interest in acquiring its entire insurance holding company operation. Cortes W. Randell, NSMC's president and chief executive officer, proposed a merger of the two corporations, offering one share of NSMC stock for every two shares of Interstate stock.

On June 10, 1969, NSMC representatives, including Randell and James F. Joy, a senior vice president and finance committee member, were invited before the Interstate directors to make a presentation concerning the proposed merger. The directors were provided with NSMC's 1968 annual report and its financial report for the first half of 1969. Randell discussed the company's acquisition program, reviewed several pending corporate acquisition commitments, and made certain earnings predictions for the fiscal year ending August 31, 1969. He also increased the earlier offer to two shares of NSMC common for every three shares of Interstate common. When certain Interstate directors expressed a desire to sell a portion of the NSMC stock which they expected to acquire in the merger, Randell responded that a registered public offering was planned for the fall of 1969, at which time the former Interstate shareholders

---

4. Cameron Brown had the largest single holding of Interstate shares; he owned approximately 16,000 shares of common stock and about 11,500 of preferred, with each of the preferred shares convertible to 20 shares of common.

5. Meyer held 1,240 shares of Interstate common stock in his own name and served, at Brown's request, as trustee of several trusts created by Brown for his children, the corpora of which were Interstate stock.

could sell up to 25 percent of their shares.[6] Very few questions were asked by Randell or Joy about the business and financial affairs of Interstate, an aspect of the meeting which surprised several of Interstate's representatives.

This meeting resulted in an agreement in principle for the merger. Essentially identical press releases were then issued by the companies, announcing the agreed upon stock exchange ratio, the estimated value of the transaction as $37 million based on the current market value of NSMC stock, and the fact that the transaction represented approximately a 100 percent premium for the Interstate shares based on their market value at the time.[7] Representations were also made in the releases as to NSMC's earnings for the first six months of fiscal 1969, which ended February 28, 1969.

The two corporations' efforts to finalize the merger agreement were not uneventful. The initial proof of the Merger Agreement, prepared by NSMC's outside counsel, failed to provide for parallel rights and obligations of the parties. In fact, as to such matters as warranties and representations, a comfort letter from independent accountants, and counsel opinion letters on legal aspects of the merger, far more was required of Interstate than of NSMC. After insistence by Interstate, however, there was agreement to substantially parallel and mutual provisions covering those matters. On August 12, the Interstate directors met to review the final version of the agreement. A copy of a report from White, Weld & Co. (White Weld), a stock brokerage and investment consultant firm retained by Interstate to prepare an in-depth study of NSMC and the proposed merger, was made available to each director. A White Weld representa-

tive explained various aspects of the report, answered questions about NSMC's accounting procedures, and recommended the merger. Following that presentation, Louis F. Schauer, who had broad experience in corporate and securities law, reviewed and explained the agreement. A proof copy of the NSMC proxy statement was also available and examined by the directors then present. Although prepared for use in connection with the merger, that statement contained no entries in the spaces for NSMC's unaudited consolidated income statement for the nine-month period ending May 31, 1969. Because of the omission, Interstate's board chairman, Tate, refused to sign the agreement. After numerous efforts at attempting to obtain the missing proxy statement data and satisfactory answers to questions concerning the omitted data, the information was finally received by telephone. The remaining directors, including Tate, then signed the merger agreement on August 15. The added information, however, was not then analyzed or reviewed to any extent by any Interstate representative.

The Merger Agreement set forth fully the terms and conditions of the understanding between the two corporations. Among other things, both corporations represented and warranted that the information "contained in Interstate's and NSMC's Proxy Statements relating to the transactions contemplated by this Agreement will be accurate and correct and will not omit to state a material fact necessary to make such information not misleading,"[8] and that the financial statements included among the provisions "are true and correct and have been prepared in accordance with generally accepted accounting principles

---

6. Because of an accounting method in use in 1969, a company was permitted to "pool" the earnings of an acquired company with the earnings of the parent as though the companies had always operated together. However, in order for NSMC to take advantage of this retroactive pooling, no more than 25 percent of the shares received in the merger exchange could be sold during the first year.

7. On June 10, 1969, NSMC's stock was selling for a bid price of $44.50 per share, while Interstate's stock was selling for a bid price of $14.25. The agreed exchange ratio of three Interstate shares for two NSMC shares had the effect of valuing the Interstate stock at approximately $30 per share, twice its then market value.

8. SEC Exhibit 31 at .127 ¶ 5(u), 131 ¶ 6(u) [Merger Agreement at 7 ¶ 5(u), 11 ¶ 6(u)].

consistently followed throughout the periods involved."[9] NSMC specifically referred to its 1968 year-end and May 31, 1969, nine-month financial statements and represented that those statements:

> fairly present the results of the operations of NSMC and its subsidiaries for the periods indicated, subject in the case of the nine month statements to year-end audit adjustments.[10]

The Agreement also provided several conditions precedent to the obligations of the two corporations to consummate the merger. One required the receipt by NSMC of an opinion letter from Interstate's counsel LBB to the effect, *inter alia*, that Interstate had taken all actions and procedures required of it by law and that all transactions in connection with the merger had been duly and validly taken, to the best knowledge of counsel, in full compliance with applicable law; a similar opinion letter was required to be delivered from NSMC's counsel to Interstate.[11] Another condition was the receipt by each company of a "comfort letter" from the other's independent public accountants. Each letter was required to state: (1) that the accountants had no reason to believe that the unaudited interim financial statements for the company in question were not prepared in accordance with accounting principles and practices consistent with those used in the previous year-end audited financials; (2) that they had no reason to believe that any material adjustments in those financials were required in order fairly to present the results of operations of the company; and (3) that the company had experienced no material adverse change in its financial position or results of operations from the period covered by its interim financial statement up to five business days prior to the effective date of the merger.[12] Although setting forth these specific conditions to consummation of the merger, the final paragraph of the Agreement also provided that:

> Anything herein to the contrary notwithstanding and notwithstanding any stockholder vote of approval of this Agreement and the merger provided herein, this Agreement may be terminated and abandoned by mutual consent of the Boards of Directors of NSMC and Interstate at any time prior to the Effective Date and the Board of Directors of any party may waive any of the conditions to the obligations of such party under this Agreement.[13]

Finally, the Agreement specified that "[t]he transactions contemplated herein shall have been consummated on or before November 28, 1969."[14]

Both NSMC and Interstate utilized proxy statements and notices of special stockholder meetings to secure shareholder approval of the proposed merger. Interstate's materials included a copy of the Merger Agreement and NSMC's Proxy Statement; the latter contained NSMC's financial statements for the fiscal year ended August 31, 1968, and the nine-month interim financial statement for the period ending May 31, 1969. Interstate shareholders were urged to study the NSMC Proxy Statement:

> The NSMC Proxy Statement contains a description of each company, relevant financial statements, comparative per share data and other information important to your consideration of the proposed merger. You are urged to study the NSMC Proxy Statement, hereby incorporated as part of this Proxy Statement, prior to voting your shares.[15]

---

9. *Id.* at 124 ¶ 5(d), 128 ¶ 6(d) [Merger Agreement at 4 ¶ 5(d), 8 ¶ 6(d)].

10. *Id.* at 128 ¶ 6(d) [Merger Agreement at 8 ¶ 6(d)].

11. *Id.* at 131–32 ¶ 8(a), 133–34 ¶ 9(a) [Merger Agreement at 11–12 ¶ 8(a), 13–14 ¶ 9(a)].

12. *Id.* at 133 ¶ 8(e), 134–35 ¶ 9(e) [Merger Agreement at 13 ¶ 8(e), 14–15 ¶ 9(e)].

13. *Id.* at 136 ¶ 18 [Merger Agreement at 16 ¶ 18].

14. *Id.* at 133 ¶ 8(k), 135 ¶ 9(j) [Merger Agreement at 13 ¶ 8(k), 15 ¶ 9(j)].

15. SEC Exhibit 32 at 2; *see also id.* at 5.

The boards of both companies recommended approval of the merger and at special shareholder meetings that approval was secured by large majorities.[16]

In mid-October, Peat Marwick began drafting the comfort letter concerning NSMC's unaudited interim financials for the nine-month period ended May 31, 1969. As issued by NSMC, those financials had reflected a profit of approximately $700,-000.

Soon after beginning work on the comfort letter, Peat Marwick representatives determined that certain adjustments were required with respect to the interim financials. Specifically, the accountants proposed that a $500,000 adjustment to deferred costs, a $300,000 write-off of unbilled receivables, and an $84,000 adjustment to paid-in capital be made retroactive to May 31 and be reflected in the comfort letter delivered to Interstate. Such adjustments would have caused NSMC to show a loss for the nine-month period ended May 31, 1969, and the company as it existed on May 31 would have broken even for fiscal 1969. Although Peat Marwick discussed the proposed adjustments with representatives of NSMC, neither the accountants nor NSMC informed Interstate of the adjustments prior to the closing.[17] A draft of the comfort letter, with the adjustments, was completed on October 30 and on the next day, the morning of the closing, it was discussed among senior partners of Peat Marwick.

## C. The Closing and Receipt of the Comfort Letter

The closing meeting for the merger was scheduled at 2 p.m. on Friday, October 31,

at the New York offices of White & Case. Brown, Meyer and Schauer were present in addition to Interstate directors Bach, Allison and Tate. The representatives of NSMC included Randell, Joy, John G. Davies, their attorney Epley and other White & Case associates.

Although Schauer had had an opportunity to review most of the merger documents at White & Case on the previous day, the comfort letter had not been delivered. When he arrived at White & Case on the morning of the merger, the letter was still not available, but he was informed by a representative of the firm that it was expected to arrive at any moment.

The meeting proceeded. When the letter had not arrived by approximately 2:15 p. m., Epley telephoned Peat Marwick's Washington office to inquire about it. Anthony M. Natelli, the partner in charge, thereupon dictated to Epley's secretary a letter which provided in part:

[N]othing has come to our attention which caused us to believe that:

1. The National Student Marketing Corporation's unaudited consolidated financial statements as of and for the nine months ended May 31, 1969:

a. Were not prepared in accordance with accounting principles and practices consistent in all material respects with those followed in the preparation of the audited consolidated financial statements which are covered by our report dated November 14, 1968;

b. Would require any material adjustments for a fair and reasonable presentation of the information shown except

**16.** At a stockholders meeting held October 8, 1969, NSMC shareholders approved an increase in the company's authorized shares and then approved the merger of Interstate and five other companies with NSMC. The Special Meeting of Interstate's shareholders was held on October 17, 1969. At that meeting, the merger with NSMC was approved by a vote of 556,931 shares of Interstate common in favor of the merger, 1450 common shares against, and all 27,000 shares of Interstate preferred in favor of the merger.

**17.** Joy of NSMC did call Brown on October 29, 1969, to inform him that Peat Marwick had almost completed its audit of NSMC for fiscal 1969, that NSMC's predicted earnings were on target, and that in an effort to make the company's books as clean as possible, Peat Marwick was proposing some changes in NSMC's financial statements which might relate back to May 1969. Joy did not inform Brown, however, of the nature of the adjustments or that they would be reflected in the comfort letter to be delivered to Interstate pursuant to the terms of the Merger Agreement.

with respect to consolidated financial statements of National Student Marketing Corporation and consolidated subsidiaries as they existed at May 31, 1969 and for the nine months then ended, our examination in connection with the year ended August 31, 1969 which is still in process, disclosed the following significant adjustments which in our opinion should be reflected retroactive to May 31, 1969:

1. In adjusting the amortization of deferred costs at May 31, 1969, to eliminate therefrom all costs for programs substantially completed or which commenced 12 months or more prior, an adjustment of $500,000 was required. Upon analysis of the retroactive effect of this adjustment, it appears that the entire amount could be determined applicable to the period prior to May 31, 1969.

2. In August 1969 management wrote off receivables in amounts of $300,000. It appears that the uncollectibility of these receivables could have been determined at May 31, 1969 and such charge off should have been reflected as of that date.

3. Acquisition costs in the amount of $84,000 for proposed acquisitions which the Company decided not to pursue were transferred from additional paid-in capital to general and administrative expenses. In our opinion, these should have been so transferred as of May 31, 1969.

2. During the period from May 31, 1969 to October 28, 1969 there has been no material adverse change in the consolidated financial position of National Student Marketing Corporation and its consolidated subsidiaries, or any material adverse change in results of operations of National Student Marketing Corporation and its consolidated subsidiaries as compared with the nine month period ended May 31, 1969 after giving retroactive effect at May 31, 1969 of the adjustments disclosed above.[18]

18. The entire letter reads as follows:

Gentlemen:

Under the date of November 14, 1968 we reported on certain financial statements and related schedules of National Student Marketing Corporation.

We have not made an examination of the consolidated financial statements nor audited the records or transactions of National Student Marketing Corporation and its consolidated subsidiaries for the nine months ended May 31, 1969. Accordingly, we express no opinion on such consolidated financial statements.

At your request, we have made a review to October 28, 1969 which does not constitute an examination in accordance with generally accepted auditing standards of National Student Marketing Corporation's consolidated financial statement as of and for the nine months ended May 31, 1969. Accordingly, we have:

(a) Read the aforementioned unaudited consolidated financial statement for the nine months period ended May 31, 1969 and the unaudited consolidated financial statements for the year ended August 31, 1969, which are the latest available interim and annual unaudited financial statements;

(b) Read the minutes of the meetings of the stockholders, Board of Directors, and Executive Committee held during the period from August 31, 1968 to October 28, 1969 included in the minute books at October 28, 1969, officials of the Company having advised us that the minutes of all meetings through that date were set forth therein; and

(c) Had discussions with officials of the Company responsible for financial and accounting matters as to transactions and events subsequent to August 31, 1968, and as to whether adjustments had been made to effect a reasonable closing at May 31, 1969.

Our work did not extend to the period from October 28, 1969 to the date of this letter. It should be understood that this limited review would not necessarily reveal adverse changes in the financial position or results of operations of the Companies or inconsistencies in the application of generally accepted accounting principles. Subject to this explanation and based upon the aforementioned limited review, nothing has come to our attention which caused us to believe that:

1. The National Student Marketing Corporation's unaudited consolidated financial statements as of and for the nine months ended May 31, 1969:

a. Were not prepared in accordance with accounting principles and practices consistent in all material respects with those followed in the preparation of the audited consolidated financial statements which are covered by our report dated November 14, 1968;

b. Would require any material adjustments for a fair and reasonable presentation of the information shown except with respect to consolidated financial statements of National

Epley delivered one copy of the typed letter to the conference room where the closing was taking place. Epley then returned to his office.

Schauer was the first to read the unsigned letter. He then handed it to Cameron Brown, advising him to read it. Although there is some dispute as to which of the Interstate representatives actually read the letter, at least Brown and Meyer did so after Schauer. They asked Randell and Joy a number of questions relating to the nature and effect of the adjustments. The NSMC officers gave assurances that the adjustments would have no significant effect on the predicted year-end earnings of NSMC and that a substantial portion of the $500,000 adjustments to deferred costs would be recovered. Moreover, they indicated that NSMC's year-end audit for fiscal

1969 had been completed by Peat Marwick, would be published in a couple of weeks, and would demonstrate that NSMC itself had made each of the adjustments for its fourth quarter. The comfort letter, they explained, simply determined that those adjustments should be reflected in the third quarter ended May 31, 1969, rather than the final quarter of NSMC's fiscal year. Randell and Joy indicated that while NSMC disagreed with what they felt was a tightening up of its accounting practices, everything requested by Peat Marwick to "clean up" its books had been undertaken.[18A]

At the conclusion of this discussion, certain of the Interstate representatives, including at least Brown, Schauer and Meyer, conferred privately to consider their alternatives in light of the apparent nonconformity of the comfort letter with the re-

Student Marketing Corporation and consolidated subsidiaries as they existed at May 31, 1969 and for the nine months then ended, our examination in connection with the year ended August 31, 1969 which is still in process, disclosed the following significant adjustments which in our opinion should be reflected retroactive to May 31, 1969:

1. In adjusting the amortization of deferred costs at May 31, 1969, to eliminate therefrom all costs for programs substantially completed or which commenced 12 months or more prior, an adjustment of $500,000 was required. Upon analysis of the retroactive effect of this adjustment, it appears that the entire amount could be determined applicable to the period prior to May 31, 1969.
2. In August 1969 management wrote off receivables in amounts of $300,000. It appears that the uncollectibility of these receivables could have been determined at May 31, 1969 and such charge off should have been reflected as of that date.
3. Acquisition costs in the amount of $84,000 for proposed acquisitions which the Company decided not to pursue were transferred from additional paid-in capital to general and administrative expenses. In our opinion, these should have been so transferred as of May 31, 1969.
2. During the period from May 31, 1969 to October 28, 1969 there has been no material adverse change in the consolidated financial position of National Student Marketing Corporation and its consolidated subsidiaries, or any material adverse change in results of operations of National Student Marketing Corporation and its consolidated subsidiaries

as compared with the nine month period ended May 31, 1969 after giving retroactive effect at May 31, 1969 of the adjustments disclosed above.

The terms "financial position" and "results of operations" are used herein in their conventional accounting sense; accordingly, they relate to the consolidated financial statements of the business as a whole and have the same meaning when used in this letter as they have when used in our report.

It is understood that this letter is for the information of Interstate National Corporation and is not to be quoted, or referred to in whole or in part, in any literature used in connection with the expense of securities except for any reference to it in an agreement and plan of merger or in a list of closing documents.

Very truly yours,

SEC Exhibit 54.

18A. The oral representations of Randell and Joy were not entirely accurate. Peat Marwick was not "tightening up" NSMC's accounting practices, but instead was simply employing the accounting principles and practices previously used by the company. *See* SEC Exhibit 54. Further, although the NSMC representatives suggested that the adjustments were a matter of timing and would be reflected in NSMC's final quarter rather than in the third quarter ended May 31, in fact a large portion of the deferred costs adjustments and the entire adjustment to paid-in capital were not included in the company's year-end financials. Transcript (Tr.) 181–83, 375–76.

quirements of the Merger Agreement.[19] Although they considered the letter a serious matter and the adjustments as significant and important, they were nonetheless under some pressure to determine a course of action promptly since there was a 4 p.m. filing deadline if the closing were to be consummated as scheduled on October 31.[20] Among the alternatives considered were: (1) delaying or postponing the closing, either to secure more information or to resolicit the shareholders with corrected financials; (2) closing the merger; or (3) calling it off completely.

The consensus of the directors was that there was no need to delay the closing. The comfort letter contained all relevant information and in light of the explanations given by Randell and Joy, they already had sufficient information upon which to make a decision. Any delay for the purpose of resoliciting the shareholders was considered impractical because it would require the use of year-end figures instead of the stale nine-month interim financials. Such a requirement would make it impossible to resolicit shareholder approval before the merger upset date of November 28, 1969, and would cause either the complete abandonment of the merger or its renegotiation on terms possibly far less favorable to Interstate. The directors also recognized that delay or abandonment of the merger would result in a decline in the stock of both companies, thereby harming the shareholders and possibly subjecting the directors to lawsuits based on their failure to close the merger. The Interstate representatives decided to proceed with the closing. They did, however, solicit and receive further assurances from the NSMC representatives that the stated adjustments were the only ones to be made to the company's financial statements and that 1969 earnings would be as predicted. When asked by Brown whether the closing could proceed on the basis of an unsigned comfort letter, Meyer responded that if a White & Case partner assured them that this was in fact the comfort letter and that a signed copy would be forthcoming from Peat Marwick, they could close. Epley gave this assurance. Meyer then announced that Interstate was prepared to proceed, the closing was consummated, and a previously arranged telephone call was made which resulted in the filing of the Articles of Merger at the Office of the Recorder of Deeds of the District of Columbia.[21] Large packets of merger documents, including the required counsel opinion letters, were exchanged.[22] The closing was

---

19. Although there is some dispute whether all the Interstate representatives present at the closing participated in the caucus, resolution of that dispute is not necessary to the disposition of this case.

20. The pressure to close on October 31 derived from a public announcement to that effect; it was therefore likely that any delay would have had an adverse impact on the stock of both companies. The 4 p.m. deadline was the closing time of the District of Columbia office where the merger documents were to be filed.

21. Because October 31, 1969, was a state holiday in Nevada, the state where Interstate was incorporated, documents reflecting the acquisition of the company by NSMC were filed in that state on Monday, November 3, 1969, to take effect as of October 31, 1969.

22. The LBB opinion letter, delivered to NSMC at the closing, reads in pertinent part:

Gentlemen:

We have acted as counsel to Interstate in connection with the merger of Interstate into NSMC pursuant to the Plan. In such capacity, we have examined the Plan together with Exhibits A, B and C thereto; the charters, by-laws in minutes of Interstate and its Subsidiaries (as defined in the Plan), corporate records, certificates of public officials and of officers and representatives of Interstate and such other documents deemed necessary to enable us to give the opinion hereinafter expressed.

Based on the foregoing and having due regard to legal considerations we deem relevant, we are of the opinion that:

\* \* \* \* \* \*

7. The Plan has been duly executed and delivered by Interstate and is a valid and binding obligation in accordance with its terms and any corporate action by Interstate required in order to authorize the transactions contemplated therein has been taken.

8. To our knowledge, neither Interstate nor any Subsidiary is engaged in or threatened with any legal action or other proceeding, or has incurred or been charged with any presently pending violation of any Federal, state or local law or administrative regulation, which would materially adversely affect

solemnized with a toast of warm champagne.

Unknown to the Interstate group, several telephone conversations relating to the substance of the comfort letter occurred on the afternoon of the closing between Peat Marwick representatives and Epley. The accountants were concerned with the propriety of proceeding with the closing in light of the adjustments to NSMC's nine-month financials. One such conversation occurred after Epley delivered the unsigned letter to the Interstate participants but before the merger had been consummated. At that time Epley was told that an additional paragraph would be added in order to characterize the adjustments. The paragraph recited that with the noted adjustments properly made, NSMC's unaudited consolidated statement for the nine-month period would not reflect a profit as had been indicated but rather a net loss, and the consolidated operations of NSMC as they existed on May 31, 1969, would show a break-even as to net earnings for the year ended August 31, 1969. Epley had the additional paragraph typed out, but failed to inform or disclose this change to Interstate. In a second conversation, after the closing was completed and the Interstate representatives had departed, Epley was informed of still another proposed addition, namely, a paragraph urging resolicitation of both companies' shareholders and disclosure of NSMC's corrected nine-month financials prior to closing. To this, he responded that the deal was closed and the letter was not needed. Peat Marwick nonetheless advised Epley that the letter would be delivered and that its counsel was considering whether further action should be taken by the firm.

The final written draft of the comfort letter arrived at White & Case late that afternoon. Peat Marwick believed that Interstate had been informed and was aware of the conversations between its representatives and Epley and of its concern about the adjustments.[23] Because of this belief and especially since the merger had been closed without benefit of the completed letter, Peat Marwick's counsel perceived no obligation to do anything further about the merger. Nonetheless, a signed copy of the final letter was sent to each board member of the two companies, presumably in an effort to underline the accountants' concern about consummation of the merger without shareholder resolicitation.

The signed comfort letter was delivered to the Interstate offices on Monday, November 3. It was first seen and read by Donald Jeffers, Interstate's chief financial officer. He had not been present at the October 31 closing or informed of the adjustments to the interim financials. Concerned, he contacted Brown immediately and read the letter to him. Since a meeting with other Interstate principals was scheduled for the next morning the letter was added to the other matters to be discussed.

The signed letter was virtually identical to the unsigned version delivered at the closing, except for the addition of the following two paragraphs:

> Your attention is called, however, to the fact that if the aforementioned adjustments had been made at May 31, 1969 the unaudited consolidated statement of earnings of National Student Marketing Corporation would have shown a net loss of approximately $80,000. It is presently estimated that the consolidated opera-

---

or impair the financial condition, business, operations, prospects, properties or assets of Interstate.

\* \* \* \* \* \*

10. All other action and proceedings required by law or the Plan to be taken by Interstate at or prior to the Effective Date in connection with the Plan and the transactions provided for therein have been duly and validly taken.

\* \* \* \* \* \*

SEC Exhibit 52.

23. This belief stemmed from representations made by Epley in his telephone conversations with Peat Marwick. From those conversations Peat Marwick received the justifiable impression that counsel for both Interstate and NSMC were aware of the problems engendered by the adjustments and had concluded that the merger could take place nonetheless. *See* SEC Exhibit 71 at 2.

tions of the company as it existed at May 31, 1969 will be approximately a break-even as to net earnings for the year ended August 31, 1969.

In view of the above mentioned facts, we believe the companies should consider submitting corrected interim unaudited financial information to the shareholders prior to proceeding with the closing.[24] The only other change was the reduction in the write-off to receivables from $300,000 to $200,000, making total negative adjustments to NSMC's nine-month financials in the amount of $784,000.

At the meeting the following day, the matter was fully discussed by the former Interstate principals. Of particular concern were the additional "break-even" and "re-solicitation" paragraphs.[25] Brown explained what had occurred at the closing and the reasons for the decision to consummate the merger. He called Meyer at LBB, who by that time was also aware of the letter. After some discussion, it was decided that more information was needed. Brown and Jeffers agreed to contact Peat Marwick and Meyer agreed that his firm would contact Epley at White & Case.

On that afternoon, Schauer contacted Epley by telephone. Epley stated that he had not known of the additional paragraphs until after the closing. He added that in any case the additions did not expand upon the contents of the earlier unsigned letter; the "break-even" paragraph simply reflected the results of an arithmetic computation of the effects of the adjustments, and the "resolicitation" paragraph was gratuitous and a matter for lawyers, not accountants.

While Schauer disagreed, Epley again responded that the additional paragraphs made no difference and that NSMC regarded the deal as closed.

Brown and Jeffers fared no better with Peat Marwick. That company's representative, Cormick L. Breslin, met briefly with several Interstate representatives on November 4. He could give no information concerning the matter other than that he had not seen a similar letter before and thought it was rather unusual.[26] Later, when contacted again by Brown, Breslin stated that the letter would have to speak for itself and his company would provide no additional information, comment or advice.

Over the next several days the Interstate directors continued their discussion of the matter, consulting frequently with their counsel, Meyer and Schauer. As they viewed it, the available options were to attempt to undo the merger, either permanently or until the shareholders could be resolicited, or to leave things as they were. The attorneys indicated that rescission would be impractical, if not impossible, since Interstate no longer existed and NSMC had indicated that it would oppose any effort to undo the merger. Meanwhile, the market value of NSMC stock continued to increase, and the directors noted that any action on their part to undo the merger would most likely adversely affect its price. By the end of the week, the decision was made to abstain from any action. Thereafter, Brown issued a memorandum to all Interstate employees announcing completion of the merger. No effort was ever made by any of the defendants to disclose

---

24. SEC Exhibit 57 at 3.

25. A significant cause of their concern was a statement contained in a copy of a letter from Peat Marwick to Epley which accompanied the signed comfort letter; that letter suggested that Epley was aware of the additional paragraphs on the day of the closing. SEC Exhibit 57, Letter dated October 31, 1969, from Peat Marwick to Mr. Eplee (sic). Jeffers, however, was concerned with the adjustments in general, stating that it was very unusual for them to be included in a comfort letter, that he was surprised the Interstate representatives had closed without a signed comfort letter, and that the

deferred cost adjustment of $500,000 was "a hell of a big adjustment," Tr. 2142.

26. Although Breslin indicated to the Interstate directors that he was unfamiliar with the comfort letter information, he in fact had discussed the contents of the letter with the Washington Peat Marwick office which had called him after the closing on October 31. The Washington office informed Breslin that adjustments were required in NSMC's financials, that the closing was nonetheless completed, and that the numbers and problems involved were going to be included in the comfort letter.

the contents of the comfort letter to the former shareholders of Interstate, the SEC or to the public in general.

### D. *The Stock Sales*

Early in the negotiations the principal Interstate shareholders understood that they would be able to sell a portion of the NSMC stock received in the merger through a public offering planned for the fall of 1969. Various shareholders, including Brown, Tate, Allison, Bach and Meyer, intended to profit by this opportunity and sell up to 25 percent of their newly acquired stock. The opportunity did not materialize, however, because within several days of the merger the NSMC operating committee decided to postpone the registration. Brown was advised that the shareholders could still sell up to 25 percent of their shares in a private placement under SEC Rule 133.[27] If they so decided, he was urged to have all use the same broker to avoid upsetting the market for the stock.

Brown then contacted Henry Meers, a personal friend and a partner in the White Weld brokerage firm, advised him of their desire to sell and inquired as to whether he could handle the transaction. Meers reported back that his firm could proceed. Brown then received the necessary authorization from the other shareholders and agreed with Meers that the sale would take place on the day of the merger closing. Meers indicated that the sale price could only be determined the day before the closing due to price fluctuations and, on October 30, the two agreed on a price of $49.50 per share.[28]

Two matters of significance to the stock sales occurred on the day of the closing. First, certain of the Interstate principals, including Brown, were informed that the amount of NSMC shares they could sell following the merger was limited due to a restriction on their Interstate stock. As a result, Brown was limited to selling only about seven percent of his newly acquired NSMC stock instead of the 25 percent previously planned.[29] Second, NSMC's in-

27. SEC Rule 133(d), promulgated under the Securities Act of 1933 and in effect during the period covered by this action, exempts certain stock transactions from the registration requirements of the Act if sold in brokers' transactions and if the seller—

(1) Does not directly or indirectly solicit or arrange for the solicitation of orders to buy in anticipation of or in connection with such brokers' transactions;

(2) Makes no payment in connection with the execution of such brokers' transactions to any person other than the broker; and

(3) Limits such brokers' transactions to a sale or series of sales which together with all other sales of securities of the same class by such person or on his behalf within the preceding 6 months will not exceed the following:

(i) If the security is traded only otherwise than on a securities exchange, approximately one percent of the shares or units of such security outstanding at the time of receipt by the broker of the order to execute such transactions, or

(ii) If the security is admitted to trading on a securities exchange, the lesser of approximately (a) one percent of the shares or units of such security outstanding at the time of receipt by the broker of the order to execute such transactions or (b) the largest aggregate reported volume of trading on securities exchanges during any one week within the four

calendar weeks preceding the receipt of such order.

17 C.F.R. § 230.133 (1969). Rule 133 was rescinded effective January 1, 1973, 37 Fed.Reg. 23636 (1972).

The sale of the NSMC stock under Rule 133 did not affect the accounting requirement limiting the amount sold to 25 percent in order to allow "pooling" of Interstate and NSMC financials. *See* note 6 *supra.*

28. The low and high bid prices of NSMC stock during the week of the closing and the first day thereafter were as follows:

| Date | Bid | |
|---|---|---|
| October 27, 1969 | $51 | – $53 |
| October 28, 1969 | 51 | – 52½ |
| October 29, 1969 | 51½ | – 52½ |
| October 30, 1969 | 49 | – 50½ ' |
| October 31, 1969 | 50 | – 54 |
| November 3, 1969 | 51 | – 54½ |

Defendants' Exhibit L 202 at 8.

29. The restriction on the sale derived from an earlier merger transaction involving Interstate. In that transaction Interstate exchanged shares of preferred stock for the stock of a company it acquired. Those receiving the preferred stock, including Brown, were supposed to have an "investment intent" which restricted the subsequent sale of their Interstate shares. Although Schauer argued that the merger of Interstate and NSMC constituted a change of circum-

house counsel Davies told Schauer that NSMC wanted an opinion from LBB in connection with the stock sales. As outlined in a memorandum prepared by White & Case for NSMC, the requested opinion was to state that LBB had made initial factual determinations as to whether the sales comported with the requirements of Rule 133(d).[30] White & Case would then consult with NSMC and prepare its own final opinion letter as to the validity of the sales under the rule. After discussing the matter with Davies, Schauer indicated that there would be no problem delivering the letter in the form and language requested.

White Weld began processing the sales on the afternoon of October 31. It subsequently sold a total of 59,500 shares of NSMC stock. The gross received was slightly less than $3 million. Brown received approximately $500,000 for his shares and Meyer received approximately $86,000 for the shares he held, including $10,000 for shares he owned and the balance for shares he held in trust for the benefit of Brown and Brown's family. White Weld was never informed of the comfort letter adjustments before it undertook the sale as agents for the Interstate principals.

Later that week a letter from Brown to NSMC and an opinion letter from LBB to NSMC, both of which addressed the Rule 133 matters, were drafted and delivered to NSMC.[31] Though prepared sometime dur-

---

stances sufficient to permit the shares to be sold, counsel for White Weld did not agree and would not give an opinion on the validity of the Rule 133 transaction as to those preferred shares of Interstate stock.

**30.** The memorandum prepared by White & Case stated in part:

We believe that procedures should be established to be followed in connection with dispositions of NSMC stock issued to persons who may be "affiliates" within the meaning of Rule 133. Prior to permitting any such disposition, you should receive the following:
1. Opinion of this firm that the transaction constitutes a "Rule 133 transaction".
2. Letter from the selling "affiliate" to the effect that:
(a) He has not and will not, directly or indirectly, solicited or arranged for the solicitation of orders to buy in anticipation of or in connection with his sales.
(b) He has made and will make no payment in connection with the execution of the sale to any person other than his broker.
(c) A statement as to the number of shares of NSMC stock sold within the preceding six months by the selling "affiliate" and all such sales by members of his immediate family and anyone else who might be deemed an "associate" of the "affiliate".

. . . . .

4. Two troublesome legal areas which may arise are the question of who constitutes an "affiliate" and how many persons may be combined into a single "person" for determining the applicability of the sale formula. In both of these situations, you should obtain an opinion of counsel for the possible "affiliate" after which we would confer with you as to the acceptability of the opinion. It is preferable for the initial determination of these questions to be made by counsel for the possible "affiliate" since it is essentially a factual matter, and they presumably are more familiar with the facts than you or we would be.
SEC Exhibit 121.

**31.** The letter sent over Brown's signature reads as follows:

Dear Sirs:
As you know, I have been acting on behalf of myself and certain other persons who may be deemed to have been "affiliates" of Interstate National Corporation in connection with the proposed disposition of a portion of the Common Stock of National Student Marketing Corporation to be distributed to us in connection with the merger of Interstate National Corporation into National Student Marketing Corporation. Orders have been placed with White, Weld & Co. for the sale of such Common Stock by the persons and in the amounts set forth on the schedule annexed hereto.
Such other persons have advised me that they have taken no action in connection with their proposed dispositions and I hereby confirm to you as follows:
(a) I have not and will not, directly or indirectly, solicited or arranged for the solicitation of orders to buy in anticipation of or in connection with our proposed sales.
(b) We have made and will make no payment in connection with the execution of our sales to any person other than our broker.
(c) Neither I nor any of such other persons have effected any sales of Common Stock of National Student Marketing Corporation within the past six months.
Very truly yours,
Cameron Brown
SEC Exhibit 123–A.
The LBB Rule 133 opinion provides:
Dear Sirs:
We are familiar with the proposed sales of Common Stock of National Student Market-

ing the week of November 3, the papers were dated October 31.

### E. Subsequent Events

Following the acquisition of Interstate and several other companies NSMC stock rose steadily in price, reaching a peak in mid-December. However, in early 1970, after several newspaper and magazine articles appeared questioning NSMC's financial health, the value of the stock decreased drastically. Several private lawsuits were filed and the SEC initiated a wide-ranging investigation which led to the filing of this action.

### II. THE PRESENT ACTION

[1] The Court has jurisdiction of this proceeding under § 22(a) of the Securities Act of 1933 (1933 Act)[32] and § 27 of the Securities Exchange Act of 1934 (1934 Act).[33] In seeking injunctive relief against the defendants, the Securities and Exchange Commission relies upon § 21(e) of the 1934 Act which in relevant part provides:

Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter [or] the rules or regulations thereunder, . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted . . . .[34]

Section 20(b) of the 1933 Act, also relied upon by the Commission, is to the same effect.[35] Each statutory provision requires the Commission to make a "proper showing" that an injunction is warranted, a showing that the Commission attempts to make in this case by proving two instances of past violations by the defendants from which future violations can be inferred and injunctive relief justified.[36] Specifically, the Commission alleges that the defendants, both as principals and as aiders and abettors, violated § 10(b) of the 1934 Act,[37] Rule 10b–5 promulgated thereunder,[38] and

---

ing Corporation referred to in the letter of Cameron Brown to you of even date herewith. A list of the proposed sellers and the number of shares which each proposes to sell are set forth in the schedule attached hereto. We hereby advise you that we are familiar with the identify (sic) of such sellers and that, in our opinion, each of such sellers is entitled to effect sales of the number of shares set opposite his name in such schedule within the limitation set forth in subsection (d) of Rule 133 under the Securities Act of 1933.

Very truly yours,
/s/ Lord, Bissell & Brook

SEC Exhibit 123.

32. 15 U.S.C. § 77v(a).

33. 15 U.S.C. § 78aa.

34. 15 U.S.C. § 78u(e).

35. 15 U.S.C. § 77t(b).

36. The Commission has apparently restricted itself to these two violations in its charges against the defendants. See Pre-Trial Brief of the Securities and Exchange Commission at 167–70, 182–85; Tr. 16–17, 2738–41; Order of November 9, 1976.

37. Section 10(b), 15 U.S.C. § 78j(b), reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

38. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

§ 17(a) of the 1933 Act,[39] through their participation in the Interstate/NSMC merger and subsequent stock sales by Interstate principals, in each instance without disclosing the material information revealed by the Peat Marwick comfort letter.[40]

The Commission, in what appears to be typical fashion, *see SEC v. Barraco*, 438 F.2d 97, 99–100 (10th Cir. 1971), makes little effort to distinguish between principals and aiders and abettors in its charges against the defendants. Although the significance of the distinction between primary and secondary liability may be dwindling in light of recent developments, *see Note, Rule 10b–5 Liability after* Hochfelder: *Abandoning the Concept of Aiding and Abetting,* 45 U.Chi.L.Rev. 218 (1977), the distinction nonetheless provides a means by which the violations can be specified and the defendants' conduct qualified. Thus, the Court will attempt to sort through the SEC allegations and delineate which charge principal violations of the antifraud provisions and which charge aiding and abetting.

The Commission charges Brown and Meyer with responsibility for proceeding with the merger of Interstate and NSMC. Since shareholder approval of the merger was secured in part on the basis of the nine-month financials which the comfort letter indicated were inaccurate, the SEC contends that Brown and Meyer should have refused to close until the shareholders could be resolicited with corrected financials. The Commission also charges the two directors with effecting the sale of NSMC stock following the merger, without first disclosing the information contained in the comfort letter. These allegations clearly constitute charges of principal violations of the antifraud provisions. *See* 3 A. Bromberg, Securities Law: Fraud § 8.5 (515) (1970). In addition, Brown is specifically charged with aiding and abetting sales of NSMC stock by Interstate principals through his issuance, with Schauer's assistance, of the Rule 133 letter to NSMC.

Numerous charges, all of which appear to allege secondary liability, are leveled against the attorney defendants. Schauer is charged with "participating in the merger between Interstate and NSMC," [41] apparently referring to his failure to interfere with the closing of the merger after receipt of the comfort letter. Such inaction, when alleged to facilitate a transaction, falls under the rubric of aiding and abetting. *See Kerbs v. Fall River Industries, Inc.,* 502 F.2d 731, 739–40 (10th Cir. 1974). Both Schauer and Meyer are charged with issuing false opinions in connection with the merger and stock sales, thereby facilitating each transaction, and with acquiescence in the merger after learning the contents of the signed comfort letter. The Commission contends that the attorneys should have refused to issue the opinions in view of the adjustments revealed by the unsigned comfort letter, and after receipt of the signed version, they should have withdrawn their

---

in connection with the purchase or sale of any security.

**39.** Section 17(a), 15 U.S.C. § 77q(a), provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.

**40.** The Commission's Amended Complaint in this action also included various charges against defendants who have since resolved their differences with the SEC, *see* note 2 *supra.* None of those charges, which in essence detail a securities fraud scheme engineered by principal officers, directors and independent accountants of NSMC and fraudulent sales of two NSMC subsidiaries, involved any of the present defendants. In fact, there does not seem to be any dispute that these remaining defendants knew nothing of the alleged misconduct by the NSMC principals.

**41.** Pre-Trial Brief of the Securities and Exchange Commission at 184.

opinion with regard to the merger and demanded resolicitation of the Interstate shareholders. If the Interstate directors refused, the attorneys should have withdrawn from the representation and informed the shareholders or the Commission. ° The SEC specifically characterizes the attorneys' conduct in issuing the Rule 133 opinion as aiding and abetting, and because their alleged misconduct with regard to the merger also appears sufficiently removed from the center of that transaction, it too will be considered under a charge of secondary liability. See *SEC v. Coven,* 581 F.2d 1020 (2d Cir. 1978); *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2d Cir. 1973); 3 A. Bromberg, *supra.* And finally, LBB is charged with vicarious liability for the actions of Meyer and Schauer with respect to the attorneys' activities on behalf of the firm.[42]

■ Since any liability of the alleged aiders and abettors depends on a finding of a primary violation of the antifraud provisions, the Court will first address the issues relating to the Commission's charges against the principals. If the evidence presented demonstrates that there was a violation in either instance the Court will then proceed to discuss whether the conduct of the various defendants also constituted aiding and abetting. / In determining whether the Commission has shown violations of the securities laws by the defendants, the Court will employ a preponderance of the evidence standard of proof.[43]

## III. PAST VIOLATIONS

■ The antifraud provisions effectuate the federal securities laws' purpose of full disclosure and prevention of unfair practices by proscribing the sale or purchase of any security through fraud, or through the use of materially false or misleading statements or omissions. If the requisite level of culpability is demonstrated, any material misstatement or omission with a sufficient nexus to the transfer of a

---

**42.** The SEC has not articulated a distinct theory upon which LBB may be held to have violated the securities laws. Instead, it simply charges the firm "with responsibility for all of Meyer's and Schauer's activities," SEC Pre-Trial Brief at 185, without citation to any statutory provisions, such as 15 U.S.C. §§ 78t(a) and 78t(b), or common law principles, such as *respondeat superior,* upon which such vicarious liability could be founded. Despite this failing, the Court need not address the significant and difficult questions concerning LBB's responsibility for the actions of Meyer and Schauer, see *SEC v. Savoy Industries, Inc.,* 190 U.S.App. D.C. ——, at —— —— & nn. 48 & 49, 587 F.2d 1149, at 1170–1171 (1978); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 48 & nn. 17 & 18 (2d Cir. 1978), since LBB has not challenged the SEC on this issue. To the contrary, the firm has fully associated itself with the conduct of both of its partners and apparently concedes its responsibility for their conduct. Further consideration of the issue is therefore unnecessary.

**43.** Although the SEC does not contest the defendants' assertion that the "clear and convincing" standard of proof governs the assessment of the evidence of fraud in this case, the application of that stringent standard to the present case nonetheless must be rejected. While routinely used in cases involving allegations of fraud, imposition of the clear and convincing standard is justified only where the conse-

quences of the finding of fraud constitute a severe deprivation to the defendant, such as deportation of an alien, *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), or revocation of registration as a broker/dealer, *Collins Securities Corp. v. SEC,* 183 U.S.App.D.C. 301, 562 F.2d 820 (1977). *SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. at —— ——, 587 F.2d at 1168. The present proceeding, like that in *Savoy Industries,* threatens no such deprivation, only the imposition of an injunction against future violations. Although the impact of an injunction upon a lawyer may be more harsh than upon persons of different occupations, see Mathews, *Liability of Lawyers Under the Federal Securities Laws,* 30 Bus.Law. 105, 106 (1975); see also *SEC v. National Student Marketing Corp.,* 402 F.Supp. 641, 652 (D.D.C. 1975), the incremental effect does not seem sufficient to justify the extraordinary step of requiring a higher standard of proof against lawyers than that which would be applicable to others. Moreover, certain of the allegations of harm asserted by the attorney defendants will occur, if at all, in subsequent independent proceedings that will be subject to their own particular standard of proof. Absent significant deprivations arising from the present proceeding, the preponderance of the evidence standard of proof is sufficient here, and will be applied. *SEC v. Savoy Industries, Inc., supra.*

security constitutes a violation.[44] Each of these principal elements will be examined separately in the context of the allegations made by the Commission. The requirement that there be a nexus between the defendants' conduct and a sale of a security will be discussed first, followed by consideration of materiality and scienter.

## A. *Nexus with a Sale*

 For the SEC to prove a violation of the antifraud provisions, it must demonstrate that the alleged misconduct was "in the offer or sale" of a security under § 17(a) or "in connection with the purchase or sale" of a security under § 10(b) and Rule 10b–5. The Commission has made the requisite showing for each of the provisions with respect to the defendants' activities leading to the closing of the merger. *SEC v. National Securities, Inc.,* 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *see SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. ——, at ——, 587 F.2d 1149, at 1171 (1978). However, the defendants [45] contest the SEC's evidence with respect to the nexus between the defendants' conduct and the stock sales by Interstate principals, and between the defendants' conduct during the week of November 3 and either of the "sales" alleged by the Commission.

 The defendants' principal argument is directed to the alleged nexus between their conduct and the stock sales. They contend there is no nexus between their actions and the stock sales since the Interstate principals committed themselves to sell the NSMC stock before receiving the unsigned comfort letter on October 31. Because the time of commitment is the "sale" for purposes of the antifraud provisions, they assert that their failure to disclose after-acquired information does not fall within the statutory proscription. Their second contention, that there was no connection between their conduct during the week following the merger and the merger or stock sales, is similar. Their position is that both "sales" occurred prior to their actions or inaction during that week, and therefore could not be affected by their alleged misconduct at that time.[46]

The Commission's response is primarily directed to the first of the defendants' contentions. It argues that no valid commitment could have been made with respect to the stock sales since White Weld was not a purchaser of the NSMC stock, but only an agent for the defendants. Further, even if a commitment could have been made with their agent, the defendants could not and did not make such a commitment prior to the time they received the unsigned Peat Marwick comfort letter at the closing. The Court finds the latter argument persuasive.[47]

---

**44.** The use of the mails and the facilities of interstate commerce is not disputed, thereby fulfilling that jurisdictional predicate. *See* 15 U.S.C. §§ 77q(a), 78j.

**45.** Although only Brown and Meyer are charged as principals, each of the defendants presents arguments against primary violations.

**46.** Although the defendants place this issue within the confines of the nexus requirement, it is sometimes considered in the context of materiality, *see Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir. 1972), for if the misrepresentation or omission is to assume actual importance in the deliberations of a reasonable investor, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), it must be capable of affecting the investment decision, thus necessitating its occurrence prior to the alleged sale. However, due to the defendants' emphasis in this instance on the lack of any possible causative

relationship between their conduct and the "sales" alleged by the Commission, it appears that the defendants' placement of the issue in the nexus context is appropriate.

**47.** The Commission's challenge to the validity of the alleged commitment with White Weld, the defendants' agent, is not insubstantial. Typically such commitments are not made with one's agent, but with the actual purchaser of the securities. In the latter instance, as noted at pp. 702–703 *infra,* Rule 10b–5 imposes "no obligation to pull back from a commitment previously *made by the buyer and accepted by the seller* because of after acquired knowledge." *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d at 891 (emphasis added). Though it is unclear whether a similar immunity applies with respect to a commitment made with one's agent, it is not implausible to suggest that in an impersonal securities transaction involving an actively traded stock a com-

In the seminal case of *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Second Circuit held that liability for insider trading violations of Rule 10b–5 attaches at the time the commitment to buy or sell is made and not when the transaction is ultimately consummated. 401 F.2d at 853 n. 17. The rationale for using the moment of commitment as the critical point in time derives from the underlying purpose of the anti-fraud provisions to protect the investment decision from inadequate disclosure and misrepresentations. Once the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision.

> A party does not, within the intendment of Rule 10b–5, use material inside information unfairly when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information, for . . . the Rule imposes "no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge." The goal of fundamental fairness in the securities marketplace is achieved by such a determination.

*Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972). *Accord, Pitts-* *burgh Coke & Chem. Co. v. Bollo*, 421 F.Supp. 908, 923 (E.D.N.Y.1976) (dicta), *aff'd on other grounds*, 560 F.2d 1089 (2d Cir. 1977); *Goodman v. Poland*, 395 F.Supp. 660, 689–91 (D.Md.1975).

In view of this authority the Court must focus its attention on the point in time, relative to receipt of the unsigned comfort letter, when the Interstate principals committed themselves to sell their NSMC stock.[48] This commitment has been defined as "the point at which, in the classical contractual sense, there was a meeting of the minds of the parties . . . ." *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d at 891.

The defendants urge that the "meeting of the minds" occurred prior to the receipt of the comfort letter, specifically on October 30 when Brown and Meers agreed on the price to be paid for the stock. As support they point to the price paid for the stock—$49.50 per share[49]—and a telephone conversation between Brown and Tate on November 3, during which Brown stated that he expected Tate to abide by the commitment made on October 30.[50] The Commission, on the other hand, argues that no valid commitment could have been made until the merger was consummated and the defendants had received their NSMC stock. In addition, it relies on the testimony of the defendants, that they did not intend to sell NSMC stock unless the merger took place, as support for the lack of a commitment as a factual matter. Under these circumstanc-

mitment with a broker is equivalent to a commitment with an unknown buyer. *Cf. SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 853 n. 17. In any event, it is unnecessary to reach this additional challenge by the Commission because the defendants' contention with regard to the time of commitment must be rejected. Moreover, even if the Court were to address the issue, it would be extremely difficult on the present record to determine the actual point of sale, and further, it is unlikely that the determination, if made, would add anything to the Court's analysis, *see* note 48 *infra*.

**48.** Receipt of the *unsigned* comfort letter is crucial because it is the version which first contained the material information which the SEC contends the defendants should have disclosed. *See* pages 705–709 *infra*. The signed version of the letter provided little additional information.

**49.** *See* note 28 *supra*.

**50.** On the morning of November 3, Meers allegedly called Brown and informed him that Tate had indicated that he and others were going to cut back on the number of shares they were to sell because the price had risen. Meers requested that Brown call Tate and reaffirm that a binding commitment had been made and that Tate was obligated to turn over his shares. Brown called Tate and made an unsuccessful attempt to persuade him to comply with the commitment. He then contacted his father, who agreed to substitute his NSMC shares for those withheld by Tate.

es, asserts the Commission, no commitment was made by the defendants until the merger was consummated and they had received their NSMC stock.[51]

The Commission's position is persuasive and indeed the evidence supports that conclusion. While the defendants may have felt committed on October 30 to the price and number of shares to be sold following the merger, the evidence clearly shows that they had no expectation or duty to proceed with the sales if the merger was aborted.[52] Such a conditional commitment is not what the courts had in mind when setting the time of commitment as the critical point for antifraud analysis. It is not some magical incantation of "commitment" that sets the point at which disclosure is no longer mandated, but rather the nature of the commitment. In order to prevent the unfair use of material inside information, the commitment must irrevocably bind the parties to their agreement, without regard to further action or inaction on their part. *See Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d at 890–91; *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d at 853 n. 17.

*Goodman v. Poland, supra,* illustrates the type of commitment required to terminate the duty to disclose material information. The defendants in that case had entered into oral stock purchase agreements with various stockholders during the period from February 28 through March 5. Each of the agreements was subject to certain conditions, with the last being expressly conditioned on all minority stockholders agreeing to sell their securities. Specific terms of a final agreement were left to be worked out by counsel. Although the defendants signed the completed agreement on March 15, it was not until March 25 that all parties had signed, and not until April 15 that the signed agreements were exchanged and the securities delivered. The court, following the reasoning of *Radiation Dynamics,* first concluded that the duty to disclose terminated on the date of commitment. It then looked to the relevant dates to determine which one met the requirements of a commitment:

> While it is true that the [defendants] had entered into oral agreements with certain of the plaintiffs herein, those agreements were contingent upon a certain number, or upon all, of the dissident minority stockholders agreeing to sell their securities. That condition was repeatedly emphasized by the [defendants], and the written Agreement of March 15, 1968 itself provided that it would not be binding until *all* the minority stockholders had signed. This Court, therefore, finds that the parties were not committed to one another until March 25, 1968, when all of the dissident minority stockholders had signed the written Agreement of Purchase and Sale.

395 F.Supp. at 691.

The circumstances here are virtually identical. Although Brown, Meyer and the other Interstate principals had agreed to certain aspects of the stock sale prior to receipt of the comfort letter, they had no intention or obligation to proceed with the sale absent the consummation of the merger of the two companies.[53] The Merger Agreement specifically stated that the obligation of either company to proceed with the merger was subject to the performance of certain conditions. Those conditions, and the recognition by the defendants that the stock sale would not occur unless the merger was consummated, barred the existence of a binding, irrevocable commitment. The earliest point at which such a commitment could have been made was after the closing

---

51. Brown's position that the SEC is prevented from challenging his commitment by its failure to present that contention in its Pre-Trial Brief must be rejected. *See* Post-Trial Brief for Cameron Brown, vol. I, at 99–101. The Commission has charged Brown and others with selling NSMC stock after receiving, but not disclosing, the comfort letter. Since, as the defendants point out, the commitment is the

"sale" for purposes of the antifraud provisions, the Commission's previous allegations encompass the present challenge to the defendants' position.

52. Tr. 968, 1597–98.

53. *Id.*

on October 31, when the merger had been completed and the conditions removed.

This conclusion is particularly justified here, where the defendants themselves played a significant role with respect to fulfilling the conditions for the merger and stock sale. Antifraud liability should not be foreclosed under such circumstances; otherwise, an insider could remain silent upon receiving material information, secure in the knowledge that he is free either to let the merger and sale proceed or to cancel them both by exercising his control over previously set conditions, whichever course appears financially more beneficial. It is this opportunity for unfair advantage that the securities laws prohibit. *See Radiation Dynamics, Inc. v. Goldmuntz, supra; SEC v. Texas Gulf Sulphur Co., supra.* The defendants having received the unsigned comfort letter prior to the "sale" of NSMC stock by the Interstate principals, their initial contention that the failure to disclose did not have a sufficient nexus with the transactions must be rejected.

Their second argument, however, concerning the lack of a causal relationship between the events of the week of November 3 and either of the "sales" alleged by the Commission, presents a different situation. The SEC has limited its charges against the present defendants to alleged violations with respect to the merger and the sale of NSMC stock by the Interstate principals.[54] Each of these "sales" occurred on October 31, immediately following the consummation of the merger. The events of the following week could not have had any effect on either of the transactions and thus fail to meet the nexus requirement. Nevertheless, they may be considered on a limited basis as "relevant to showing non-disclosure or fraud with respect to events before that date." *Goodman v. Poland,* 395 F.Supp. at 691.

### B. *Materiality*

Also essential to an alleged violation of the antifraud provisions is that the omission or misstatement be material. In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court articulated the legal standard of materiality with respect to misleading proxy statements.[55] The Court emphasized that "[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." 426 U.S. at 445, 96 S.Ct. at 2130. Elaborating further, the Court stated:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills' [Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial

---

**54.** *See* note 36 *supra.*

**55.** Although *Northway* defined materiality in the context of an alleged proxy statement violation of Rule 14a–9, 17 C.F.R. § 240.14a–9, promulgated under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), its logic applies equally to determinations of materiality under the antifraud provisions of the federal securities laws. *See S. D. Cohn & Co. v. Woolf,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 445–46 n. 8, 96 S.Ct. 2126; *SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. ——, at ——, 587 F.2d 1149, at 1171; *Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir. 1977); *Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F.2d 916, 919–20 (8th Cir. 1977); *Wright v. Heizer Corp.,* 560 F.2d 236, 248 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1040 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

In addition, there is no unfairness in applying the *Northway* standard to the defendants' conduct in 1969. The Supreme Court's decision in *Northway* merely resolved the conflict whether the test for materiality was that the information in question "might" or "would" be important to the reasonable investor. Application of the stricter "would" standard, often articulated during the period surrounding the alleged misconduct in this case, *see TSC Industries, Inc. v. Northway, Inc., supra,* puts no burden on the defendants.

likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted). Thus, the trier of fact must consider all the circumstances surrounding the transaction and then objectively must assess the inferences a reasonable shareholder would draw from the omitted or misrepresented facts and the significance of those inferences to him in his investment decision.

■ In the present case, the alleged misstatement or omission is the failure to disclose, either to the Interstate shareholders or to the purchasers of the NSMC stock sold by Interstate principals following the merger, the adjustments contained in the unsigned comfort letter delivered at the October 31 closing.[56] Although the defendants contend that the adjustments were not material, and make several arguments in support of that position, the Court concludes that the defendants have misconceived the legal standard of materiality and that the evidence presented clearly demonstrates that the comfort letter adjustments would have assumed "actual significance in the deliberations of the reasonable shareholder" or investor, and were therefore material.

■ Initially, the sheer magnitude of the adjustments supports a finding that they were material. The interim financials issued by NSMC reflected a profit of $702,270 for the nine-month period ended May 31, 1969. Peat Marwick, NSMC's independent accountants, determined that significant negative adjustments were required to be made in those financials to make them not misleading.[57] Those adjustments, contained in the unsigned comfort letter and referred to therein as "significant", included a $500,000 adjustment to deferred costs, a $300,000 write-off of unbilled receivables, and an $84,000 adjustment to paid-in capital, all of which were retroactive to May 31, 1969.[58] The aggregate adjustments amounted to $884,000, thereby reducing the reported profit by 125 percent and resulting in a net loss for the nine-month period of approximately $180,000. Viewing these figures alone, it is difficult to imagine how the adjustments could not be material.[59]

---

**56.** The failure to disclose the information contained in the comfort letter, and thereby to correct the previously issued nine-month financials, can be considered as either an implied misrepresentation or a simple nondisclosure. *See* 2 A. Bromberg, Securities Law: Fraud § 6.11(510) (Supp.1977).

**57.** Although an accountant's view of materiality is not the same as the legal test, it may be relevant to that determination. William C. Colona, the Peat Marwick accountant assigned to prepare the comfort letter, testified that the adjustments were "very significant" and that they were made because they were material to the nine-month financials. He defined his concept of materiality by referring to a rule of thumb used by accountants, whereby an adjustment is material if it would reduce or increase net earnings, as previously reported, by ten percent of the previously reported figure. Tr. 203–08. As noted in the text *infra,* the adjustments contained in the unsigned comfort

letter reduced the net earnings for the nine-month period by approximately 125 percent.

**58.** Although the defendants suggest that Peat Marwick's action in making the adjustments retroactive to May 31 simply reflects a conservative accounting practice, the comfort letter itself indicates that Peat Marwick followed the accounting principles and practices that it had used in preparing NSMC's previous financial statements. In any case, the suggestion does not address the question of whether, regardless of the reason, making the adjustments as of May 31 would have altered the total mix of information available and have assumed actual significance in the deliberations of the reasonable investor.

**59.** The reduction of the write-off of unbilled receivables to $200,000 in the *signed* comfort letter has little effect on the overall magnitude of the adjustments.

The defendants, however, disagree. Among other things, they argue that the comfort letter adjustments were not material to the merger transaction because they failed to reflect accurately the financial status of NSMC as it existed on October 31, the date of the closing and the time at which Brown, Meyer and the other Interstate principals were required to decide whether to proceed with the closing or to abandon the merger, at least on its existing terms.[60]

■ In making this argument, the defendants ignore the fact that the Interstate shareholders made their investment decision to approve the merger a few weeks before the date of the closing, and on the basis of information provided them at that time, largely consisting of the Interstate proxy materials. Therefore, in determining whether the comfort letter adjustments were material, consideration must be given to the information available to the shareholders at the time they approved the merger, not to whatever additional information was available to the Interstate representatives at the closing. See TSC Industries, Inc. v. Northway, Inc., supra; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970);[61] SEC v. Texas Gulf Sulphur Co., 401 F.2d at 862.

In a merger transaction such as that presented here, accurate financial information is necessary in order for a shareholder fairly to be able to vote. "Perhaps nothing is more relevant to a vote on whether or not to approve a merger than the earnings picture of the acquiring company, at least to the stockholder of the company being acquired." Republic Technology Fund, Inc. v. Lionel Corp., 483 F.2d 540, 547 (2d Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974). "Accordingly, failure to convey these earnings accurately, if the discrepancy is at all substantial, has to be material to the person being misled." 483 F.2d at 551; see Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 840 (2d Cir.), cert. denied, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952).

The interim financials issued by NSMC for the nine-month period were included in the proxy materials sent to the shareholders of Interstate and NSMC. Although the shareholders were also sent audited year-end financials for 1968, the interim statements were NSMC's most current earnings statements available to the Interstate shareholders at the time they approved the merger. As such, they would clearly be of importance to the shareholders of the acquired company in deciding whether to approve the merger.

■ Moreover, in this instance the Interstate shareholders were specifically informed of the importance of the NSMC financial statements by the proxy materials sent them in connection with the proposed merger. They were advised "to study the NSMC Proxy Statement, hereby incorporated as part of this Proxy Statement, prior to voting your shares," because the NSMC

60. Relying on General Time Corp. v. Talley Industries, Inc., 403 F.2d 159 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), the defendants contend that a greater showing of materiality is necessary in a situation where there is no opportunity for the shareholders to vote on the basis of corrected financial information. Assuming there was no such opportunity here, the Court finds General Time to be distinguishable. That case involved an attempt to revoke proxies on the day of the shareholder meeting, not a transfer of securities on the basis of financial statements which were emphasized as important to the shareholders' decision in favor of the merger. As the court in General Time noted, the standard of materiality "is somewhat more elusive in relation to statements issued in a contested election than in regard to a . . . .

representation designed to induce the purchase or sale of securities, or a proxy statement seeking approval of a proposed corporate transaction . . . ." 403 F.2d at 162. The unquestionable importance of the financials involved here meets the standard of materiality applicable to the antifraud provisions. See note 55 supra.

61. Determining materiality by what insiders knew at the time the merger was closed would effectively resurrect the position rejected by the Supreme Court in Mills. However, instead of substituting a "judicial appraisal of the merger's merits," 396 U.S. at 381, 90 S.Ct. at 620, the shareholders' decision would be supplanted by that of a few insiders.

Proxy Statement contained, among other things, "relevant financial statements . . important to your consideration of the proposed merger." [62] The proxy materials also contained copies of the Merger Agreement, which not only represented and warranted that the financial statements of NSMC were accurate and truthful, but in addition, provided a specific requirement of a comfort letter from NSMC's independent accountants to the effect that they had no reason to believe that the unaudited interim financial statements for the nine months ended May 31, 1969, were not prepared in accordance with generally accepted accounting principles or that any material adjustments were necessary to present accurately the results of NSMC's operations. These provisions effectively assured the Interstate shareholders that the financial statements would be accurate. The comfort letter requirement provided an extra measure of assurance, since its receipt by Interstate was a condition precedent to effectuation of the shareholders' investment decision.[63]

■ The defendants also urge that the conduct of Brown, Meyer and other Interstate representatives at the closing evidences the lack of materiality with respect to the comfort letter adjustments. Those actions, however, are not determinative of materiality since, as noted, that question "is an *objective* one, involving the significance of an omitted or misrepresented fact to a *reasonable* investor," *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 445, 96 S.Ct. at 2130 (emphasis added), not the significance of the information to various individual investors.[64]

■ In any event, even if their conduct and the information available to them at the time of the merger were determinative of materiality, the evidence presented reveals that though the Interstate representatives may not have considered the adjustments decisive to their decision to close the merger, they clearly considered them important and significant—in other words, material. Upon receipt of the comfort letter, Schauer read it and immediately gave it to Brown, advising him to read it as well. Thereafter, the Interstate representatives questioned those present from NSMC concerning the meaning and effect of the adjustments. They then caucused privately to consider their course of action in light of the information in the letter. They discussed various options, including postponement or calling off the merger. Returning to the conference room, they asked further questions of the NSMC representatives

---

62. SEC Exhibit 32 at 2.

63. Brown has suggested that calling off the merger in order to resolicit shareholders would have overruled the initial vote of those shareholders. Post-Trial Brief for Cameron Brown, vol. I, at 120. But in this case, with several conditions precedent, including receipt of a conforming comfort letter, built into the Merger Agreement approved by the Interstate shareholders, it is just as likely that, under the circumstances, aborting the merger more closely comported with the expressed will of the shareholders.

The defendants also contend that the waiver provision contained in the Merger Agreement permitted the directors of the two corporations to waive any of the conditions precedent, including receipt of the comfort letter. Although the directors could possibly have waived receipt of the comfort letter itself pursuant to the provision, once it was received the shareholder authorization could not extend to nondisclosure of the receipt therein of material information affecting the shareholders' approval of the merger. The waiver provision could not autho-

rize the parties to dispense with the antifraud provisions of the securities laws and transfer securities on the basis of materially false and misleading information. *See Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843–44 (2d Cir.), *cert. denied*, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952); 15 U.S.C. §§ 77n, 78cc(a). Insofar as *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), possibly suggests a different result, the Court respectfully disagrees.

64. The defendants also attempt to equate the actions of insiders of other companies acquired by NSMC with those of the reasonable shareholder, since those insiders also received the Peat Marwick comfort letter and still proceeded with their respective mergers with NSMC. While their actions are relevant to the determination of materiality, the value is minimal since they, like the defendants here, had more information than did the reasonable Interstate shareholder.

about the adjustments. After receiving assurances as to the accuracy of the year-end earnings estimates and that the adjustments in the comfort letter were the only ones required to be made in the interim financials, the Interstate representatives decided to proceed with the closing. The fact that, after taking these various precautions, Brown, Meyer, and other Interstate representatives made a business judgment that the merger was still in the best interests of the Interstate shareholders does not mean that the adjustments were not material. Decisiveness is not equivalent to materiality.

> [Materiality] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that . . . the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132; *see Mills v. Electric Auto-Lite Co.*, 396 U.S. at 384–85, 90 S.Ct. 616 (1970). Despite their business judgment to proceed, the conduct of the Interstate representatives clearly demonstrates that they considered the adjustments significant and important in their deliberations. The adjustments would be no less important in the deliberations of the reasonable investor. At the very least, the reasonable shareholder would likely have been disturbed by the adjustments, just as were the defendants, and therefore might have sought further explanation before deciding to approve the merger. *Cf. Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1302–03 (2d Cir. 1973).[65]

In summary, the Court concludes that the adjustments contained in the unsigned comfort letter would have altered the total mix of information available and would have assumed actual significance in the deliberations of the reasonable Interstate shareholder. Although it is arguable whether the better business decision under the circumstances was to proceed with the merger, the antifraud provisions prohibit such a course of action when a material misrepresentation or omission has occurred, regardless of the business justification for closing the merger. There is no doubt that the adjustments were material, and therefore Brown and Meyer should have refused to proceed with the merger absent disclosure to and resolicitation of the shareholders.

The adjustments were equally material with respect to the decisions of those purchasing NSMC stock from the Interstate principals. Although the proxy materials were prepared in connection with the merger, they also provided the general investing public, including those purchasers, with the most current information as to the financial condition of NSMC. The revelations in the unsigned comfort letter that the nine-month financials were inaccurate and misleading clearly would have assumed actual significance in the deliberations of those purchasing the NSMC stock from Brown, Meyer and other Interstate principals. As such, Brown and Meyer were prohibited from selling their newly acquired NSMC shares without first disclosing the comfort letter information.

#### C. Scienter

Finally, there must be proof that Brown and Meyer acted with the requisite degree of culpability. Unfortunately, the level of culpability required in an SEC injunctive

---

**65.** The defendants argue that their business decision to complete the merger and thereby to invest substantially in the fortunes of NSMC supports a finding that the adjustments contained in the comfort letter were not material, for if the adjustments were as adverse as the SEC suggests, the Interstate principals, especially Brown, would not have risked their interests by agreeing to the merger. The defendants are correct insofar as they argue that the actions of insiders are relevant to the determination of materiality. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 851. However, as noted, their actions, as well as those of the insiders of other companies, note 64 *supra,* and those of Jeffers, Interstate's chief financial officer, note 25 *supra,* clearly indicate that the comfort letter information, although not decisive, was important to their decision to proceed with the merger.

action is far from certain. Negligence or the lack of due diligence was previously considered sufficient. *E.g., SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2d Cir. 1973); *SEC v. Pearson,* 426 F.2d 1339, 1343 (10th Cir. 1970); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d at 854–55, 866–68 (concurring opinion); *but see, e.g., SEC v. Coffey,* 493 F.2d 1304, 1314 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). However, that position has been significantly eroded by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), where the Supreme Court held that scienter, defined as a "mental state embracing intent to deceive, manipulate, or defraud," 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381, was a necessary element in a private damage action under § 10(b) and Rule 10b–5. While the Court expressly refused to consider whether scienter was also required in an injunctive action alleging violations of § 10(b) and Rule 10b–5, its analysis of the language of the statutory provision strongly suggests that proof of scienter is required in all actions under § 10(b), regardless of the identity of the parties involved. *See* 425 U.S. at 217–18, 96 S.Ct. 1375 (Blackmun, J., dissenting). Nevertheless, courts have still failed to reach a consensus on the issue. *Compare SEC v. Southwest Coal & Energy Co.,* 439 F.Supp. 820, 825 (W.D.La.1977); *SEC v. American Realty Trust,* 429 F.Supp. 1148, 1171 (E.D.Va.1977); *and SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226, 1240–41 (S.D. N.Y.1976) (scienter required), *aff'd on other grounds,* 565 F.2d 8 (2d Cir. 1977) *with SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 540–41 (1st Cir. 1976); *SEC v. Hart,* No. 78–65 (D.D.C. May 26, 1978) (alternate holding); *and SEC v. Goetek,* 426 F.Supp. 715, 726 (N.D.Cal.1976) (scienter not required).[66]

Similar confusion prevails with respect to the role of scienter in an injunctive action involving alleged violations of § 17(a). Several courts have focused on the Supreme Court's suggestion in *Hochfelder* that the language of § 17(a) may be broader in scope than that of § 10(b), *see* 425 U.S. at 212–13 & n. 32, 96 S.Ct. 1375, and have concluded that § 17(a) encompasses both intentional and negligent misconduct, at least in actions brought by the SEC for injunctive relief. *SEC v. Coven,* 581 F.2d 1020, at 1027–1028 (2d Cir. 1978); *SEC v. Southwest Coal & Energy Co.,* 439 F.Supp. at 826; *see Comment, Scienter and SEC Injunction Suits,* 90 Harv.L.Rev. 1018, 1021 n. 24 (1977). Other courts, however, have come to a contrary conclusion and have required scienter under § 17(a) as well as under § 10(b). *SEC v. American Realty Trust, supra; see SEC v. Cenco, Inc.,* 436 F.Supp. 193 (N.D.Ill.1977).

■ Though these are important issues, the resolution of which would be welcome to the securities bar, the Court concludes that they need not be decided at this time, because the conduct of Brown and Meyer in this case meets the prevailing standard for scienter.

After receiving the unsigned comfort letter at the closing, the Interstate representatives immediately expressed concern over the new information; they caucused privately and sought and received various oral assurances from the NSMC representatives. Moreover, the new information included adjustments which were far from insubstantial; they reduced the reported profit of NSMC by several hundreds of thousands of dollars and converted what had been a sizable profit into a net loss. Despite the obvious materiality of this information, especially as demonstrated by their conduct,

66. *See generally,* Lowenfels, *Scienter or Negligence Required for SEC Injunctions Under Section 10(b) and Rule 10b–5: A Fascinating Paradox,* 33 Bus.Law. 789 (1978); Comment, *Scienter and SEC Injunction Suits,* 90 Harv.L.Rev. 1018 (1977); Note, *Scienter's Scope and Application in Rule 10b–5 Actions: An Analysis in Light of Hochfelder,* 52 Notre Dame Law. 925 (1977); Note, *SEC Enforcement Actions to Enjoin Violations of Section 10(b) and Rule 10b–5:*

*The Scienter Question,* 5 Hofstra L.Rev. 831 (1977); Note, *Scienter and Injunctive Relief Under Rule 10b–5,* 11 Ga.L.Rev. 879 (1977); Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder,* 29 Stan.L.Rev. 213 (1977); Berner & Franklin, *Scienter and Securities and Exchange Commission Rule 10b–5 Injunctive Actions: A Reappraisal in Light of Hochfelder,* 51 N.Y.U.L.Rev. 769 (1976).

they made a conscious decision not to disclose it. Such conduct has been found sufficient to meet the scienter requirement. *McLean v. Alexander,* 420 F.Supp. 1057, 1080–82 (D.Del.1976); *see Nassar & Co., Inc. v. SEC,* 185 U.S.App.D.C. 125, 130 n. 3, 566 F.2d 790, 795 n. 3 (1977) (Leventhal, J., concurring); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2d Cir. 1973).

This knowing failure to disclose does not alone support a finding of scienter here. Also relevant are certain extrinsic factors, such as the presence of trading in the security during the period in question, actions taken by the defendant to remedy his prior actions, the pattern of the defendant's conduct, and any other similar conduct by the defendant. *See SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. at 1242. The Commission concedes that none of the defendants has been involved in other misconduct, either before or since the incidents alleged here. Further, the present actions took place within a short period of time, with some pressure on the participants to choose a course of action and proceed.

Nevertheless, it cannot be ignored that Brown and Meyer expected to profit handsomely from the merger and the subsequent stock sales.[67] They were in no haste to disseminate the comfort letter information, and in fact they never revealed the adjustments, even after NSMC's year-end audit had been released and their fears of the adjustments being taken out of context

should have been assuaged. Finally, although it is difficult to assess their concern with regard to the market value of NSMC stock it is apparent that a major reason for not disclosing the information was the protection of the investments made by Interstate shareholders, including themselves, by avoiding any action which could have a detrimental effect on the price of the stock. These circumstances provide strong additional support for an inference that the defendants acted with scienter.

In any event, to the extent an inference of *actual* intent to deceive, manipulate, or defraud may be inappropriate, the defendants' actions here clearly constitute "the kind of recklessness that is equivalent to wilful fraud," *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d at 868 (concurring opinion), and which also satisfies the scienter requirement. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44–47 (2d Cir. 1978); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1040, 1044 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1978); *SEC v. Hart, supra; see SEC v. American Realty Trust,* 429 F.Supp. at 1171 n. 8; *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. at 1243 n. 4; *McLean v. Alexander,* 420 F.Supp. at 1080–81. The failure to disclose the material information in this case was neither inadvertent, *compare SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. at 1242, nor the product of simple forgetfulness, *see Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d at 1045 n. 20,[68] but

67. The exchange ratio provided the Interstate shareholders with a one hundred percent premium on the value of their stock, *see* note 7 *supra,* and the value of both stocks was rising steadily, *see* note 28 *supra.*

68. The *Sundstrand* court formulated a two-part test for recklessness: first, the danger of misleading investors must be objectively obvious, and second, the defendant's conduct must, subjectively, have been the product of more than "inexcusable neglect." The latter requirement was imposed because of *Hochfelder,* see 425 U.S. at 190 n. 5, 96 S.Ct. 1375, and requires that the omission result from "something more egregious than even 'white heart/empty head' good faith." 553 F.2d at 1045. As an example, the court stated that if "a defendant genuinely forgot to disclose information or [if] it never came to his mind, . . . even though the

proverbial 'reasonable man' would never have forgotten," 553 F.2d at 1045 n. 20, the subjective portion of the recklessness test would not be met.

Brown alleges that he relied upon the advice of counsel, and that absent any indication from them that proceeding with the merger and stock sales was unlawful, he in good faith went ahead with the transactions. To the extent such reliance could be considered as a possible defense to the present action, *see* Floor, *The Scienter Requirement Under Rule 10b–5 and Reliance on Advice of Counsel,* 12 New England L.Rev. 191, 213–22 (1976), presumably as an equivalent to the "forgetfulness" example in *Sundstrand,* the Court finds it inapposite here. Brown did not rely upon actual advice of counsel, but, if at all, on counsel's silence, and this despite the fact that he never asked for a spe-

instead the result of a conscious decision made by the defendants. In view of the obviousness of the danger that investors would be misled by their failure to disclose the material information, such conduct must be considered reckless. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d at 1047–48 (obvious danger of misleading investor, coupled with conscious decision not to disclose information, establishes recklessness as a matter of law).

 Accordingly, the Court finds that Brown and Meyer violated § 10(b), Rule 10b–5, and § 17(a) through their participation in the closing of the Interstate/NSMC merger and through their sales of NSMC stock immediately following the merger, in each instance without first disclosing the material information contained in the unsigned comfort letter.

## IV. AIDING AND ABETTING

 The Court must now turn to the Commission's charges that the defendants aided and abetted these two violations of the antifraud provisions. The violations themselves establish the first element of aiding and abetting liability, namely that another person has committed a securities law violation. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d at 47; *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir. 1975); *SEC v. Coffey*, 493 F.2d at 1316. The remaining elements, though not set forth with any uniformity, are essentially that the alleged aider and abettor had a "general awareness that his role was part of an overall activity that is improper, and [that he] knowingly and substantially assisted the violation." *SEC v. Coffey, supra.* Accord, *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d at 47–48; *Woodward v. Metro Bank of Dallas*, 522 F.2d at 94–97. See generally, Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa. L.Rev. 597 (1972); 3 A. Bromberg, *supra* at § 8.5(530).

 The Commission's allegations of aiding and abetting by the defendants, specified at page 700 *supra*, seem to fall into four basic categories: (1) the failure of the attorney defendants to take any action to interfere in the consummation of the merger;[69] (2) the issuance by the attorneys of an opinion with respect to the merger; (3) the attorneys' subsequent failure to withdraw that opinion and inform the Interstate shareholders or the SEC of the inaccuracy of the nine-month financials; and (4) the issuance by the attorneys and Brown of an opinion and letter, respectively, concerning the validity of the stock sales under Rule 133. The SEC's position is that the defendants acted or failed to act with an awareness of the fraudulent conduct by the principals, and thereby substantially assisted the two violations. The Court concurs with regard to the attorneys' failure to interfere with the closing, but must conclude that the remaining actions or inaction alleged to constitute aiding and abetting did not substantially facilitate either the merger or the stock sales.

As noted, the first element of aiding and abetting liability has been established by the finding that Brown and Meyer committed primary violations of the securities laws. Support for the second element, that the defendants were generally aware of the fraudulent activity, is provided by the previous discussion concerning scienter. With the exception of LBB, which is charged with vicarious liability, each of the defendants was actually present at the closing of the merger when the comfort letter was delivered and the adjustments to the nine-month financials were revealed. Each was

---

cific opinion on the legality of closing in light of the massive adjustments revealed by the Peat Marwick comfort letter. This blind inaction hardly constitutes good faith reliance on counsel.

**69.** Although only Schauer and LBB are charged with failing to interfere in the merger, apparently because Meyer was more closely involved, it is clear that the SEC's charges in this instance are against Interstate's counsel in general and therefore the term "attorney defendants" is used.

present at the Interstate caucus and the subsequent questioning of the NSMC representatives; each knew of the importance attributed to the adjustments by those present. They knew that the Interstate shareholders and the investing public were unaware of the adjustments and the inaccuracy of the financials. Despite the obvious materiality of the information, *see* section III–B *supra,* each knew that it had not been disclosed prior to the merger and stock sale transactions. Thus, this is not a situation where the aider and abettor merely failed to discover the fraud, *see Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 52 (Mansfield, J., dissenting), or reasonably believed that the victims were already aware of the withheld information, *Hirsch v. du Pont,* 553 F.2d 750, 759 (2d Cir. 1977). The record amply demonstrates the "knowledge of the fraud, and not merely the undisclosed material facts," *Hirsch v. du Pont, supra,* that is required to meet this element of secondary liability. *See* Ruder, *supra* at 630–31.

■ The final requirement for aiding and abetting liability is that the conduct provide knowing, substantial assistance to the violation. In addressing this issue, the Court will consider each of the SEC's allegations separately. The major problem arising with regard to the Commission's contention that the attorneys failed to interfere in the closing of the merger is whether inaction or silence constitutes substantial assistance. While there is no definitive answer to this question, courts have been willing to consider inaction as a form of substantial assistance when the accused aider and abettor had a duty to disclose. *Woodward v. Metro Bank of Dallas,* 522 F.2d at 97; *see Kerbs v. Fall River Industries, Inc.,* 502 F.2d at 740; *Brennan v. Midwestern United Life Ins. Co.,* 417 F.2d 147, 154 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). Although the duty to disclose in those cases is somewhat distinguishable, in that they contemplate disclosure to an op-

posing party and not to one's client, they are sufficiently analogous to provide support for a duty here.

Upon receipt of the unsigned comfort letter, it became clear that the merger had been approved by the Interstate shareholders on the basis of materially misleading information. In view of the obvious materiality of the information, especially to attorneys learned in securities law, the attorneys' responsibilities to their corporate client required them to take steps to ensure that the information would be disclosed to the shareholders. However, it is unnecessary to determine the precise extent of their obligations here, since it is undisputed that they took no steps whatsoever to delay the closing pending disclosure to and resolicitation of the Interstate shareholders. But, at the very least, they were required to speak out at the closing concerning the obvious materiality of the information and the concomitant requirement that the merger not be closed until the adjustments were disclosed and approval of the merger was again obtained from the Interstate shareholders. Their silence was not only a breach of this duty to speak, but in addition lent the appearance of legitimacy to the closing, *see Kerbs v. Fall River Industries, Inc., supra.* The combination of these factors clearly provided substantial assistance to the closing of the merger.

■ Contrary to the attorney defendants' contention, imposition of such a duty will not require lawyers to go beyond their accepted role in securities transactions, nor will it compel them to "err on the side of conservatism, . . . thereby inhibiting clients' business judgments and candid attorney-client communications."[70] Courts will not lightly overrule an attorney's determination of materiality and the need for disclosure. However, where, as here, the significance of the information clearly removes any doubt concerning the materiality of the information, attorneys cannot rest on asserted "business judgments" as justification for their failure to make a legal deci-

---

**70.** Post-Trial Memorandum and Proposed Conclusions of Law of Defendants Lord, Bissell & Brook, Max E. Meyer, and Louis F. Schauer at 98.

sion pursuant to their fiduciary responsibilities to client shareholders.

The Commission also asserts that the attorneys substantially assisted the merger violation through the issuance of an opinion that was false and misleading due to its omission of the receipt of the comfort letter and of the completion of the merger on the basis of the false and misleading nine-month financials.[71] The defendants contend that a technical reading of the opinion demonstrates that it is not false and misleading, and that it provides accurate opinions as to Interstate's compliance with certain corporate formalities. Of concern to the Court, however, is not the truth or falsity of the opinion, but whether it substantially assisted the violation. Upon consideration of all the circumstances, see *Woodward v. Metro Bank of Dallas,* 522 F.2d at 97, the Court concludes that it did not.

Contrary to the implication made by the SEC, the opinion issued by the attorneys at the closing did not play a large part in the consummation of the merger. Instead, it was simply one of many conditions to the obligation of NSMC to complete the merger. It addressed a number of corporate formalities required of Interstate by the Merger Agreement, only a few of which could possibly involve compliance with the antifraud provisions of the securities laws.[72] Moreover, the opinion was explicitly for the benefit of NSMC, which was already well aware of the adjustments contained in the comfort letter. Thus, this is is not a case where an opinion of counsel addresses a specific issue and is undeniably relied on in completing the transaction. *Compare SEC v. Coven,* 581 F.2d 1020, at 1028; *SEC v. Spectrum, Ltd.,* 489 F.2d 535 (2d Cir. 1973). Under these circumstances, it is unreasonable to suggest that the opinion provided substantial assistance to the merger.

The SEC's contention with regard to counsel's alleged acquiescence in the merger transaction raises significant questions concerning the responsibility of counsel. The basis for the charge appears to be counsel's failure, after the merger, to withdraw their opinion, to demand resolicitation of the shareholders, to advise their clients concerning rights of rescission of the merger, and ultimately, to inform the Interstate shareholders or the SEC of the completion of the merger based on materially false and misleading financial statements. The defendants counter with the argument that their actions following the merger are not subject to the coverage of the securities laws.

The filing of the complaint in this proceeding generated significant interest and an almost overwhelming amount of comment within the legal profession on the scope of a securities lawyer's obligations to his client and to the investing public.[73] The very initiation of this action, therefore, has provided a necessary and worthwhile impetus for the profession's recognition and assessment of its responsibilities in this area. The Court's examination, however, must be more limited. Although the complaint alleges varying instances of misconduct on the part of several attorneys and firms, the Court must narrow its focus to the present defendants and the charges against them.

Meyer, Schauer and Lord, Bissell & Brook are, in essence, here charged with failing to take any action to "undo" the merger. The Court has already concluded that counsel had a duty to the Interstate shareholders to delay the closing of the merger pending disclosure and resolicitation with corrected financials, and that the breach of that duty constituted a violation of the antifraud provisions through aiding and abetting the merger transaction. The Commission's charge, however, concerns the period following that transaction. Even if the attorneys' fiduciary responsibilities to the Interstate shareholders continued be-

---

71. SEC Exhibit 52.

72. *See* note 22 *supra.*

73. For an extensive listing of articles dealing with the issue, see Hoffman, *On Learning of a Corporate Client's Crime or Fraud—the Lawyer's Dilemma,* 33 Bus.Law. 1389, 1404–05 n. 38 (1978).

yond the merger, the breach of such a duty would not have the requisite relationship to a securities transaction, since the merger had already been completed.[74] It is equally obvious that such subsequent action or inaction by the attorneys could not substantially assist the merger.

■ The final contention of the SEC concerns the issuance by the attorneys and Brown of the Rule 133 opinion and letter, respectively. Little discussion is necessary with respect to this charge, for the Commission has clearly failed to show that these documents substantially assisted the stock sales. Neither of the documents were required by the Merger Agreement, but were requested by NSMC at the closing of the merger. The documents were not intended for the investing public, but for the sole use of NSMC and its counsel in preparing a formal, independent opinion concerning the validity of the sales under Rule 133. Further, the documents were limited to primarily factual issues relevant to the requirements of the Rule, and in no way indicated that they could be relied upon with regard to compliance with the antifraud provisions. Under the circumstances, the Court concludes that the Rule 133 documents issued by the attorneys and Brown did not substantially assist the stock sales by Interstate principals, specifically Brown and Meyer.

Thus, the Court finds that the attorney defendants aided and abetted the violation of § 10(b), Rule 10b–5, and § 17(a) through their participation in the closing of the merger.

## V. APPROPRIATENESS OF INJUNCTIVE RELIEF

■ Although the Commission has proved past violations by the defendants, that does not end the Court's inquiry. Proof of a past violation is not a prerequisite to the grant of injunctive relief, see *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), nor by itself necessarily sufficient to justify such relief, see *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8 (2d Cir. 1977); *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975), but it may, in combination with other factors, warrant an inference of future misconduct by the charged party, *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972). The crucial question, though, remains not whether a violation has occurred, but whether there exists a reasonable likelihood of future illegal conduct by the defendant, "something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co., supra.* Thus, the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir. 1978).

■ The factors which are relevant to such a showing have been previously stated by this Court:

The character of the past violations, the effectiveness of the discontinuance and the bona fides of the expressed intent to comply are considered. The number and duration of past wrongs, the time which has elapsed since the last violation, the opportunity to commit further illegal acts, the novelty of the violation, and the harmful impact of the injunction on the defendant are objective factors which the courts have examined. Subjective inquir-

---

**74.** As noted, the Commission apparently has restricted its charges against these defendants to the two violations involved in the merger and the stock sales by Interstate principals. *See* note 36 *supra.* Because the charge of acquiescence in the merger suggests the possibility of a continuing violation with respect to other sales, the Court has carefully examined the record to determine whether the SEC has alleged as a basis for liability under this charge any transactions other than the merger. After reviewing the complaint, the SEC's pre- and post-trial briefs, and the transcripts, the Court finds that the Commission has not fairly asserted a claim of continuing violation in this instance. Thus, the alleged inaction of the attorneys after the merger had no link with the securities transaction in the merger, *see* page 705 *supra,* and could not have provided substantial assistance to the already completed merger.

ies into the wilfulness or bad faith in a defendant's prior conduct and the sincerity of his representations not to violate the law are also pertinent. *SEC v. National Student Marketing Corp.,* 360 F.Supp. 284, 297 (D.D.C.1973). *Accord, SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976); *SEC v. Management Dynamics, Inc., supra; SEC v. Penn Central Co.,* 425 F.Supp. 593, 597 (E.D.Pa.1976). The Court must assess these factors and determine, under the "totality of circumstances", "[w]hether the inference that the defendant is likely to repeat the wrong is properly drawn . . . ." *SEC v. Management Dynamics, Inc., supra.* Exercising the broad discretion accorded it in making this determination, *SEC v. Universal Major Industries Corp.,* 546 F.2d at 1048; *SEC v. National Student Marketing Corp., supra,* the Court concludes that in this instance injunctive relief is not warranted.

The Commission has not demonstrated that the defendants engaged in the type of repeated and persistent misconduct which usually justifies the issuance of injunctive relief. *See, e. g., SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. ——, at —— n. 37, ——, 587 F.2d 1149, at 1162; *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 100; *SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir. 1974). Instead, it has shown violations which principally occurred within a period of a few hours at the closing of the merger in 1969. The Commission has not charged, or even suggested, that the defendants were involved in similar misconduct either before or after the events involved in this proceeding. Thus, the violations proved by the SEC appear to be part of an isolated incident, unlikely to recur and insufficient to warrant an injunction. *See SEC v. Bausch & Lomb, Inc.,* 565 F.2d at 19; *SEC v. Parklane Hosiery Co.,* 422 F.Supp. 477, 487 (S.D.N.Y.1976), *aff'd,* 558 F.2d 1083 (2d Cir. 1977). The Commission appears to agree, for in the six years since the filing of this action, it has made no attempt to obtain interlocutory injunctive relief against these defendants. Such inaction argues strongly against the need for injunctive relief. *See SEC v. Parklane Hosiery Co., supra.*

Further, it is difficult to characterize the violations presented here as either "willful, blatant, and often completely outrageous," *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1101, or as the "garden variety fraud" urged by the Commission, SEC Post-Trial Brief at 129. There is no evidence to suggest that these defendants knew about the comfort letter adjustments prior to the receipt of the unsigned comfort letter at the closing; and after receiving the letter, the defendants were under some pressure to determine a course of action, either to proceed with the transactions as scheduled or to abort both the merger and stock sales. Although it has now been found that they unlawfully and with scienter decided to proceed, their actions in this regard hardly resemble the deliberate and well-planned fraudulent scheme frequently found in securities fraud cases.

Finally, the Commission asserts that an injunction is necessary because the professional occupations of the defendants provide significant opportunities for further involvement in securities transactions. It notes that Brown holds positions as a director and as a consultant with NSMC, and that Meyer, Schauer and LBB continue to be involved in various corporate activities, including securities transactions, as part of their legal practice. While these opportunities distinguish the present defendants from those who, because they completely lack such opportunities, should not be subject to the threat of an injunction, *see SEC v. National Student Marketing Corp.,* 360 F.Supp. at 300, they do not alone justify relief. In fact, various circumstances indicate that this factor is not as one-sided as the Commission suggests. Although Brown retains his positions with NSMC, he is in effect virtually retired; the likelihood of his being involved in a securities transaction, other than as an investor, seems quite small. *See SEC v. Parklane Hosiery Co., supra.* While the attorney defendants are more likely to be so involved, that fact is countered somewhat by their professional responsibilities as attorneys and officers of the court to conform their conduct to the

dictates of the law. The Court is confident that they will take appropriate steps to ensure that their professional conduct in the future comports with the law.[75]

After considering the "totality of circumstances" presented here, the Court concludes that the Securities and Exchange Commission has not fulfilled its statutory obligation to make a "proper showing" that injunctive relief is necessary to prevent further violations by these defendants. Accordingly, judgment will be entered for the defendants and the complaint will· be dismissed.*

---

**75.** The Commission contends that the defendants' failure to recognize the seriousness of their misconduct, by continuing to maintain that their actions were lawful and proper, demonstrates the need for an injunction. The Court, however, considers the defendants' conduct in this regard as simply putting the SEC to its burden of making a proper showing that injunctive relief is warranted. In the absence of more egregious conduct, such as dilatoriness or bad faith, the defendants will not be penalized for fully defending this action.

* In an Order dated May 19, 1977, the Court specified that it would reserve rulings on certain objections to the admissibility of deposition testimony and documentary exhibits until the conclusion of trial. Rulings were reserved on SEC Exhibits 523 and 1053, and on Defendant's Exhibits L106 and S141a. Exhibits 523, L106 and S141a are deemed admitted, and the objections to the admissibility of Exhibit 1053 are sustained and that document is not admitted. Both parties have also objected to certain designations of deposition testimony. Each of . the objections to such designations is overruled.